UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-CR-0037-CVE |
| ) | |
| GUADALUPE BERNARDO DE LA ) | |
| TORRE, a/k/a Gato, a/k/a Guadalupe ) | |
| Bernardo Delatora, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion to Suppress Evidence (Dkt. # 14). Defendant asserts that he has a limited understanding of the English language and, while he understood simple questions asked by police officers, he did not have a sufficient grasp of English to voluntarily consent to a search of his bedroom or to waive his Miranda rights.

**I.**

Tulsa Police Department (TPD) Officer Randy Mackenzie works in the Special Investigation Unit, Narcotics Division (SID Narcotics Division), of TPD and, on February 5, 2009, he received a tip from a confidential informant that unknown Hispanic males were selling cocaine from an apartment located at 7460 E. 49th Street, Apartment # 4, Tulsa, Oklahoma. Mackenzie and two other members of the SID Narcotics Division, TPD Officers Jeff Eddings and David Brice, drove to the apartment in Brice's undercover vehicle. Around 9:30 p.m, Mackenzie and Eddings approached the front door of the apartment to initiate a consensual encounter, also known as a "knock and talk," and Brice waited near the back door to prevent the occupants of the apartment from escaping or disposing of evidence. Each officer wore plain clothes and carried a concealed

firearm. Each officer testified that they understand a few simple phrases in Spanish, but none of them speaks or understands Spanish well. As they approached the apartment, Mackenzie and Eddings noticed that lights were on inside the apartment and they heard people talking. Mackenzie knocked on the door and a male, later identified as Lorenzo Miranda-Villalobos,[1] answered the door. Both officers showed Mirando-Villalobos their badges. Mackenzie asked Miranda-Villalobos if he spoke good English, and he replied that he did. Mackenzie asked Miranda-Villalobos if the officers could enter the apartment and he replied "Yeah, come in." He opened the door further and allowed the officers to enter.

When the officers entered the apartment, they observed three other Hispanic males in the living room. The men were identified as Guadalupe Bernardo De La Torre, Gilberto Jimenez, and Joel Deluna. Mackenzie asked the men who lived in the apartment, and De La Torre responded that "Me and Lorenzo do." Mackenzie asked the men if any of them spoke English, and De La Torre stated that he and Miranda-Villalobos spoke English. Mackenzie learned that a woman named "Saige" was in a bedroom and he walked to the northeast bedroom in the apartment to make contact with her. The woman identified herself as Saige Bowman and she left the bedroom to sit with the

---

[1] At the time, police found photo identification identifying Miranda-Villalobos as Lorenzo Chavez-Alonzo and, defendant referred to Miranda-Villalobos as "Chavez" throughout his motion to suppress and at the suppression hearing. In his own criminal case, Miranda-Villalobos has informed the presiding judge that his true and correct name is Lorenzo Miranda-Villalobos, <u>United States v. Lorenzo Miranda-Villalobos</u>, 09-CR-36-TCK, Dkt. # 16, and the Court will refer to him as "Miranda-Villalobos" in this opinion and order.

four men in the living room.[2] Due to the number of people in the apartment, Mackenzie asked Brice to enter the apartment for officer safety.

Mackenzie asked Miranda-Villalobos if he would speak with Mackenzie, and the two men stepped into the kitchen. Mackenzie told Miranda-Villalobos that he had received information that cocaine was being sold from the apartment. Mackenzie asked Miranda-Villalobos which bedroom was his, and Miranda-Villalobos pointed to the northwest bedroom, although he claimed he slept on the couch. Mackenzie requested permission to search the apartment for cocaine, and Miranda-Villalobos said "Yeah, we don't sell cocaine." Mackenzie took Miranda-Villalobos back to the living room and asked De La Torre to go to the kitchen with him. Mackenzie and De La Torre went to the kitchen and Mackenzie advised De La Torre that he had received a tip that cocaine was being sold from the apartment. De La Torre said "No," implying that no one sold cocaine from the apartment, and Mackenzie asked De La Torre if he could search the apartment for cocaine. De La Torre said "Sure, we don't do that." Mackenzie asked De La Torre which bedroom was his, and he pointed to the northeast bedroom. Mackenzie escorted De La Torre back to the living room. At the suppression hearing, Mackenzie acknowledged that the did not use the word "consent" when asking Miranda-Villalobos or De La Torre for permission to search, but he believed that the responses to his questions indicated that both men understood his questions and consented to a search of the apartment.

Brice searched the northwest bedroom and Mackenzie searched the northeast bedroom. While the search was taking place, Eddings stayed with the four men and Bowman in the living

---

[2]   Bowman initially gave police a false name, because she had outstanding warrants and believed that she would be arrested if she gave her correct name. She subsequently informed police of her correct name.

3

room. In the northeast bedroom, police seized a shoe box containing $1,575 in United States currency, eight baggies containing white powder, a functional digital scale with white powder residue, empty baggies, and a cell phone with the name "Gato" on it. In that bedroom, Mackenzie found men's clothing and numerous pictures of De La Torre. The white powder tested positive for cocaine. The total weight of the cocaine seized from the northeast bedroom was 1256.3 grams. In the northwest bedroom, police searched an unlocked safe, which contained: $2,400 in United States currency, three baggies containing white powder, a magazine loaded semi-automatic pistol, multiple baggies, a functional digital scale, an empty holster, and a badge. Police also found a box of sandwich bags, a key to the safe, and a speed loader with five rounds of ammunition. The white powder tested positive for cocaine. The total weight of the cocaine seized from the northwest bedroom was 64.41 grams.

Eddings testified that he engaged in casual conversation with De La Torre, in English, while the other officers were searching the bedrooms. Eddings asked De La Torre if he lived in the apartment, and De La Torre stood and pointed to the northeast bedroom. Eddings testified that he attempted to speak to Deluna and Jimenez, but they would not respond to his questions and he did not believe they understood English. Eddings asked Bowman if she spoke Spanish, and she indicated that she spoke some Spanish. At the suppression hearing, Bowman confirmed that she speaks and understands a little Spanish, but her knowledge of the Spanish language is quite limited and she is not fluent.

After completing the search, Mackenzie took Miranda-Villalobos into the kitchen and read Miranda-Villalobos his <u>Miranda</u> rights in English from a card issued by TPD. Miranda-Villalobos stated that he spoke English and understood his rights, and he agreed to talk to Mackenzie.

4

Miranda-Villalobos informed Mackenzie that he is from Mexico City, Mexico, and he confirmed that he keeps his possessions in the northwest bedroom. He also told Mackenzie that De La Torre is his roommate and De La Torre goes by the nickname "Gato." When Mackenzie asked about the cocaine found in the northwest bedroom, Miranda-Villalobos began speaking Spanish and acted as if he did not understand English. Mackenzie took Miranda-Villalobos back to the living room and asked De La Torre to return with him to the kitchen. Mackenzie read De La Torre his <u>Miranda</u> rights from a card. De La Torre stated that he spoke English and understood the rights that Mackenzie read to him. De La Torre waived his <u>Miranda</u> rights and answered Mackenzie's questions. De La Torre stated that he is from Jalisco, Mexico, and he occupies the northeast bedroom of the apartment. He admitted that he uses the nickname "Gato" and the cell phone found in the northeast bedroom belongs to him. He claimed that he works in construction and does not sell cocaine, and he was unaware that cocaine was located in the northeast bedroom. De La Torre never said – in English or Spanish – that he didn't understand English. Mackenzie testified that he did not ask Miranda-Villalobos or De La Torre to sign written <u>Miranda</u> waivers, because the officers did not have forms on their persons or in Brice's vehicle. Each officer testified that they do not keep official forms in undercover vehicles, because they conduct controlled buys from these vehicles and the presence of a written waiver could alert a suspect that a transaction was an undercover police operation.

Mackenzie escorted De La Torre back to the living room for a short time and prepared to write an arrest and booking report. Mackenzie testified he asked De La Torre to return to the kitchen for a third time, and De La Torre provided information to Mackenzie to complete the form, which was introduced at the hearing as Government Exhibit 1. At the suppression hearing, the

government introduced as Government Exhibit 3 a copy of a Mexican photo identification for De La Torre, but Mackenzie testified that he did not rely on the photo identification to prepare the arrest and booking report. At some time after the search was completed but before the arrest and booking report was prepared, Brice claims that he had a conversation with De La Torre in English. Brice testified that he was looking at a BlackBerry found in the living room and commented that he could not use most of the functions. De La Torre laughed and said that he felt the same way. Following completion of the arrest and booking report, De La Torre was placed in handcuffs and arrested on a felony charge of trafficking cocaine and a misdemeanor charge of possession of drug-related paraphernalia.

Except for some limited factual issues that will be addressed below, the events at the apartment that evening are not significantly disputed. The key factual issue is De La Torre's ability to speak and understand English, and the parties have presented conflicting evidence on this issue. The government called all three officers on the scene to testify that De La Torre spoke and understood English that evening. De La Torre called four witnesses, and proffered testimony of a fifth witness, indicating that defendant had a limited knowledge of English and he could understand and respond only to simple questions in English. Terry Lee Boone, Jr. testified that he knew De La Torre as a helper on a carpet installation crew for approximately three or four months between late 2006 and early 2007, and he did not believe that De La Torre spoke more than rudimentary English. When Boone needed to communicate with De La Torre, he need someone to serve as an interpreter. However, he has not spoken to De La Torre in two years. Bret Swab, a criminal defense attorney, testified that he briefly represented De La Torre in state court based on charges stemming from the February 5, 2009 search. Swab was retained by Juanita Alverez to represent De La Torre, and she

6

informed Swab that De La Torre did not speak English. Based on Alvarez's statement, Swab did not attempt to communicate with De La Torre directly in English. Bowman testified that she has known De La Torre for about a year and she was not able to speak to him in English. Bowman stated that De La Torre had some ability to speak simple phrases in English and he would indicate by not responding or saying "no se" if he could not understand her. She claims that police attempted to speak with De La Torre in English before and during the search, and they became frustrated when De La Torre did not understand or would not respond to their questions. She also claims that De La Torre asked for an interpreter and attempted to communicate to police that he did not speak English. Alvarez testified that De La Torre worked for her as a carpet installation subcontractor for about four months in 2006, and De La Torre could not communicate with customers or co-workers in English. She has known De La Torre for about three years and he has often called her to translate or speak on his behalf with English speakers. De La Torre proffered the testimony of Mark Ogle, a pretrial services officer for the United States Probation Office. Ogle would have testified that he was unable to conduct a pretrial interview of De La Torre in English and he used an interpreter for the interview.

The government relies on the testimony of Mackenzie, Eddings, and Brice to establish that De La Torre was able to communicate in English and understood the questions asked of him. The government also offered the testimony and written report (Government Exhibit 2) of Special Agent Darrell Withem of the Bureau of Alcohol, Tobacco, Firearms and Explosives. Withem requested a search warrant for the cell phone found in the northeast bedroom, and a search warrant was issued by a federal magistrate judge. Withem found 70 incoming and 34 outgoing text messages on the cell phone. In his report, he noted that 14 of the incoming messages and 10 of the outgoing messages were in English. However, all of the outgoing messages were sent from 5:22 p.m. to 5:47 p.m. on

January 24, 2009, and each message was outgoing only to a person identified as "Temo." Bowman testified that Temo is a close friend and she acknowledged that she used De La Torre's cell phone on occasion.[3]

## II.

Defendant claims that his primary language is Spanish and he does not have a sufficient knowledge of English to voluntarily consent to a search when the request for consent was made in English. Defendant may also be challenging the admissibility of statements he made to Mackenzie following the search.[4] The government responds that defendant conversed with police officers in English and affirmatively represented that he could speak English, and he freely and voluntarily consented to a search of his bedroom.

## A.

The Fourth Amendment ordinarily prohibits the warrantless search of a person's home as per se unreasonable. Georgia v. Randolph, 547 U.S. 103, 106 (2006); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Police face a higher burden when entering a person's home, because

---

[3] At the suppression hearing, the Court determined that Bowman used De La Torre's cell phone to sent text messages to "Temo" in English. Based on this finding, the most reasonable conclusion is that Bowman sent the outgoing messages in English and the existence of text messages in English on De La Torres' cell phone does not show that De La Torre sent or received text messages in English. Therefore, Withem's report is not probative of any issue before the Court.

[4] Defendant's motion to suppress evidence does not expressly raise any issue concerning the admissibility of his statements to officers following the search, although his argument that he did not voluntarily consent to a search based on his inability to understand English reasonably suggests that defendant may also intend to challenge the validity of his Miranda waiver. Although defendant has not directly raised this issue, the voluntariness of defendant's consent and the voluntariness of his Miranda waiver are closely related and the Court will consider both issues.

"[f]reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." Payton v. New York, 445 U.S. 573, 587 (1980). Police can enter a person's home with consent, even if probable cause does not exist, provided that the consent is "freely and voluntarily" given. United States v. Cruz-Mendez, 467 F.3d 1260, 1265 (10th Cir. 2006). A court must review the totality of the circumstances to determine if consent was voluntary. United States v. Santurio, 29 F.3d 550, 552 (10th Cir. 1994). The Tenth Circuit has articulated a two-part test to determine if consent is voluntary:

> First, the government must proffer "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." Furthermore, the government must prove that this consent was given without implied or express duress or coercion.

United States v. Angulo-Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995). The mere fact that police approached defendant's apartment to initiate the encounter does not create an inference that defendant's consent was obtained through coercion. United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005). The Tenth Circuit has identified a list of non-exclusive factors that are often relevant to determine if consent was voluntary:

> the location of the encounter, particularly whether the defendant is "in an open public place where he [is] within the view of persons other than law enforcement officers;" whether the officers "touch or physically restrain" the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically "advised defendant at any time that he had the right to terminate the encounter or refuse consent."

United States v. Zapata, 997 F.2d 751, 756-57 (10th Cir. 1993) (internal citations omitted).

In cases when a defendant claims that he does not speak or understand English, any consent given for a search may be invalid if the language barrier rendered the defendant's consent

involuntary. United States v. Corral, 899 F.2d 991, 995 (10th Cir. 1990). The Tenth Circuit has not adopted a bright-line test to determine when a defendant's language barrier renders consent involuntary, but simply treats a defendant's grasp of English as a factor in the voluntariness analysis. United States v. Zubia-Melendez, 263 F.3d 1155, 1163 (10th Cir. 2001); United States v. Valdez, 899 F.2d 991, 994-95 (10th Cir. 1990). The Fifth Circuit has stated that "in regard to Spanish speaking defendants, where there is sufficient conversation between the suspect and law enforcement officers to demonstrate that the suspect had an adequate understanding of English to fully comprehend the situation, a finding that consent was voluntary may be proper." United States v. Alvarado, 898 F.2d 987, 991 (5th Cir. 1990). The Eleventh Circuit directs district courts to consider whether a defendant was able to "interact intelligently with police." United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999).

The evidence offered by both sides at the suppression raises a credibility issue concerning defendant's ability to understand Mackenzie's request for consent to search the apartment. The testimony of the police officers conducting the search shows that defendant affirmatively represented that he and Miranda-Villalobos spoke English and defendant answered questions in English. However, Bowman testified that defendant requested an interpreter and police officers exhibited frustration over defendant's inability to speak English. Defendant has presented the testimony of five witnesses, including Bowman, who consistently testified that defendant has a limited understanding of English and is not able to communicate effectively in English. Thus, the issue before the Court is not whether defendant speaks or understands any English. The Court is faced with the issue of whether defendant understood sufficient English to voluntarily consent to a search of the apartment.

Defendant does not claim that he spoke or understood no English; he claims he is not sufficiently fluent to consent. Defendant has presented the testimony or proffer of five witnesses supporting his assertion that he was not a fluent English speaker, but the evidence is of varying assistance to the Court in determining if defendant was able to understand Mackenzie's request for consent to search the apartment. The testimony of Boone and Swab does not assist the Court. Boone testified that he knew defendant in late 2006 and early 2007, but he has not seen defendant for at least two years. Therefore, Boone's testimony is of limited value in determining defendant's current ability to understand and speak English. Swab testified that he relied on Alvarez's statement that defendant did not speak English, and he made no attempt to communicate with defendant in English. Swab has no personal knowledge of defendant's ability or inability to speak English, and his testimony simply serves as a recitation of Alvarez's statements concerning defendant's English skills. To be clear, the Court is not finding that these witnesses are not credible, only that their testimony is not helpful in determining defendant's ability to understand a request for consent in English. Defendant also proffered the testimony of Mark Ogle, a United States Probation Officer, concerning his inability to conduct a pretrial services interview of defendant in English. Ogle is an officer of the Court and he is a reliable witness. However, his testimony is of limited value. The fact that defendant could not or would not conduct a pretrial interview in English is not probative of defendant's ability to communicate in English, only that he did not with Ogle.

The Court finds that Bowman was not a credible witness. She admitted that she lied to police about her name on February 5, 2009, and she has two prior felony convictions for possessing a controlled substance with intent to distribute. She testified that she met defendant through a man identified as "Temo" Gutierrez, but she was extremely vague about the nature of her relationship

11

with Temo. Her claim that they were simply close friends is contradicted by other evidence presented at the hearing. See Government Exhibit 2. Bowman's explanation for her presence at the apartment during the evening of the search is vague, and her version of those events is wholly inconsistent with the testimony of all of the police officers. Bowman claims that defendant repeatedly indicated that he could not speak English or understand the officers' questions, and the officers became frustrated by defendant's inability to communicate in English. During the search, Mackenzie, Eddings, and Brice were separated during much of the search and it is reasonable to assume that, if Bowman's testimony were at all credible, some aspect of her testimony would be corroborated by the testimony of one of the officers. As will be discussed below, the testimony of the police officers is remarkably consistent and each officer testified that an interpreter could have been brought to the apartment if one were needed. In addition, much of the information learned by police that evening could be obtained only by communicating with defendant. Due to Bowman's general lack of credibility and her completely unsubstantiated version of the search, the Court does not rely on Bowman's testimony in determining if defendant voluntarily consented to a search.

Defendant also presented the testimony of Alvarez, a former employer of defendant who has maintained a friendship with defendant after their employment relationship ended. She testified that defendant worked for her as a subcontractor for about four months over two years ago, and he returned to Mexico to take care of his parents when they became ill. When defendant returned to the United States, he stayed at her house for a couple of days until he could find somewhere else to stay. Defendant is also the godfather of one of her children. Alvarez testified that defendant has a limited understanding of English and he often calls her to translate written English or speak directly to an English speaker on his behalf. Alvarez's testimony is not wholly unreliable and the Court

generally found her to be a credible witness. Alvarez testified that defendant understands and speaks simple English phrases. However, other evidence suggests that Alvarez may have overstated defendant's limitations with the English language and, given her relationship with defendant, it is reasonable to conclude that she may have some bias as a witness on defendant's behalf. The Court does not discount Alvarez's testimony in its entirety, but will give this testimony limited weight in determining the voluntariness of defendant's consent.

The Court finds that the testimony of Mackenzie, Eddings, and Brice is consistent and credible, and there is no reason to discount their version of the search on February 5, 2009. Mackenzie and Eddings testified that Miranda-Villalobos voluntarily admitted them into the apartment and stated that he spoke good English. Once inside the apartment, defendant informed Mackenzie that he lived in the apartment with Miranda-Villalobos. When Mackenzie interviewed defendant in the kitchen for the first time, defendant sufficiently understood the nature of Mackenzie's questions and he denied any involvement with cocaine trafficking. Defendant was also able to identify his bedroom in response to Mackenzie's questions. This shows that defendant understood Mackenzie's initial questions. When requesting consent, Mackenzie asked a straightforward question without any complex legal terminology and defendant's response shows that he understood what Mackenzie was asking. If Mackenzie had phrased the question in terms of "consent," this may have been more confusing and created a greater likelihood that defendant would not understand the question. Instead, Mackenzie simply asked if he could search the apartment and defendant's response, "Sure, we don't do that [sell cocaine]," clearly indicated that he consented to the search. Mackenzie's second conversation with defendant occurred in the kitchen after the search. Mackenzie testified that he read defendant a <u>Miranda</u> warning in English from a card issued

by TPD. Defendant indicated that he understood his rights by stating "yes," and agreed to speak with Mackenzie. In response to questions from Mackenzie, defendant stated that he was from Jalisco, Mexico and confirmed that he slept in the northeast bedroom. Defendant sufficiently understood Mackenzie's questions to grasp that Mackenzie was asking about the cocaine found in the northeast bedroom and denied that it belonged to him. The fact that defendant made exculpatory statements in English shows that he understood the implication of Mackenzie's questions and was voluntarily proceeding with the interview in English. Eddings testified that Jimenez and Deluna did not appear to understand English and there was no attempt to question them. This suggests that police would have complied with a request for an interpreter or ceased any interrogation of defendant if he made any attempt to communicate that he did not understand English. Aside from Bowman's discredited testimony, there is no evidence that defendant made any attempt to request an interpreter or alert police officers to a potential language problem, and it was reasonable for police to believe that defendant understood the questions asked of him.

Other evidence occurring after Mackenzie's initial request to search confirms that defendant understood what was happening and could intelligently interact with police officers. At the suppression hearing, the government offered the arrest and booking report prepared by Mackenzie following the search. Government Exhibit 1. Some of the information in the report, such as defendant's eye and hair color and height and weight, were estimated by Mackenzie without defendant's assistance. However, the testimony at the suppression hearing established that defendant did not present his Mexican photo identification (Government Exhibit 3) to Mackenzie and Mackenzie could not have filled in defendant's date of birth without assistance from defendant. The date of birth listed in the arrest and booking report is accurate and this supports Mackenzie's

testimony that defendant assisted him with the report. Even if defendant did present the photo identification to Mackenzie, it is not clear that Mackenzie would have understood the birth date on the card because it is written in Spanish and he had difficulty locating it at the suppression hearing. Government Exhibit 3. In addition, the spelling of defendant's name in the arrest and booking report is different from that on the photo identification, and this supports Mackenzie's testimony that he relied on defendant's statements to complete the report. If Mackenzie had seen the photo identification at the time he wrote the report, it is reasonable to assume that he would have accurately copied the name from the card.

Brice testified that he talked to defendant in English in the living room after the search was completed. Brice was looking at a BlackBerry found in the living room, not the cell phone taken from the northeast bedroom, and commented that he did not know how to use most of the functions on cell phones. Defendant laughed and said that he has the same reaction to cell phones. Brice responded that he knows how to make calls and send text messages, but he does not know how to do much else with a cell phone. Defendant stated that he was "pretty much the same way." The Court finds that Brice's testimony concerning this conversation is credible, and defendant's conversation with Brice suggests that he had more than limited ability to understand and converse in English.

Considering the totality of the circumstances, the Court finds that defendant understood Mackenzie's request for consent to search the apartment and he voluntarily consented to the search. There is sufficient evidence in the record demonstrating that defendant understood and spoke some English. Most importantly, defendant affirmatively represented to Mackenzie that he spoke English and he made appropriate responses to Mackenzie's questions throughout the encounter. Defendant's

responses indicate that he knew a criminal investigation was occurring and he clearly attempted to deny any knowledge of or responsibility for cocaine found in the apartment. Defendant made no attempt to request an interpreter, nor did he give any indication to police that he did not understand English. The evidence also shows that defendant assisted Mackenzie in preparing the arrest and booking report by answering questions in English. There is no evidence in the record suggesting that police officers threatened defendant or engaged in any coercive behavior. The Court finds, based on the totality of the circumstances, that defendant understood Mackenzie's request for consent to search the apartment and defendant's motion to suppress evidence should be denied.

**B.**

Although defendant's motion to suppress evidence does not specifically raise any issue concerning the admissibility of statements, this issue should be considered due to the nature of defendant's argument and the evidence presented at the suppression hearing. At the suppression hearing, defense counsel asked witnesses some questions going to defendant's ability to understand a Miranda warning, and it is reasonable to assume that defendant intends to challenge the admissibility of any statements he made to Mackenzie in addition to the voluntariness of his consent. Therefore, the Court will consider the admissibility of defendant's statements to Mackenzie as an independent ground to suppress certain evidence.

In Miranda v. United States, 384 U.S. 436 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444. Under this rule, the court must suppress a statement, even if voluntary, if a proper warning was not given before police initiated custodial

interrogation of a suspect. United States v. Patane, 542 U.S. 630 (2004); United States v. McCurdy, 40 F.3d 1111, 1117 (10th Cir. 1994). However, the fruit of the poisonous tree rule does not apply even if defendant successfully proves that police obtained a statement through custodial interrogation without giving a Miranda warning. United States v. Pettigrew, 468 F.3d 626, 636 (10th Cir. 2006). The Miranda exclusionary rule requires only that the court exclude any "unwarned statement" itself. Oregon v. Elstad, 470 U.S. 298, 307 (1985).

Defendant does not dispute that he received a Miranda warning and he waived his Miranda rights. However, he argues that his waiver was involuntary and any statements he made following the search should be suppressed, because he did not understand English sufficiently to waive his Miranda rights. The government bears the burden to prove by a preponderance of the evidence that defendant voluntarily waived his Miranda rights. Colorado v. Connelly, 479 U.S. 157, 168-69 (1986). The Court must consider the totality of the circumstances to determine whether defendant's waiver was voluntary. United States v. Hernandez, 93 F.3d 1493, 1051 (10th Cir. 1996). The Tenth Circuit has identified five factors that should be considered to determine whether a Miranda waiver was voluntary:

> (1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment."

United States v. Carrizales-Toledo, 454 F.3d 1142 (10th Cir. 2006) (quoting United States v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997)). These factors are not exclusive and a court should consider any other evidence showing that "the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." Id. (quoting United States v. Rith, 164 F.3d 1323, 1333 (10th Cir. 1999)).

Although the factors are somewhat different than those applicable to the consent analysis, the same evidence and credibility determinations compel the Court to find that defendant voluntarily waived his Miranda rights and his statements are admissible at trial. The Miranda warning, as read to defendant from a pre-printed card, is not complex and a person with a limited understanding of English may be expected to understand his Miranda rights. Defendant's responses to Mackenzie's questions about the presence of cocaine in the apartment clearly indicate that defendant understood the nature of Mackenzie's questions, and defendant did not give any indication that he did not understand Mackenzie's questions. Instead, defendant stated that he worked in construction and denied that he sold cocaine. This strongly suggests that defendant knew the consequences of possessing cocaine and made exculpatory statements in English in an attempt to avoid criminal charges. Mackenzie did not threaten or coerce defendant during the interrogation and, if defendant had not wanted to respond to or did not understand Mackenzie's questions, there is no evidence showing that Mackenzie elicited involuntary responses from defendant. For the same reasons stated above, the Court finds that defendant understood a Miranda waiver read to him in English and voluntarily waived his Miranda rights.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence (Dkt. # 14) is **denied**.

**DATED** this 20th day of April, 2009.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT